HAWKINS, Presiding Justice,
for the Court:
Lamar Campbell appeals from his conviction in the circuit court of the Second Judicial District of Bolivar County on two counts of burglary and one of grand larceny, and sentence as a recidivist to thirty years without parole and $1,000 fine.
*1313 He challenges the sufficiency of the evidence, claims that the circuit judge encouraged him to testify, and refused to grant him a severance. We find there was sufficient evidence to support the jury’s verdict, and the record does not support the remaining assignments. We affirm.
FACTS
Mr. and Mrs. James H. Milstead lived just outside the corporate limits of Cleveland on Highway 6. Mr. Milstead, a retired postal employee, had a severe brain disorder, needing care and attention by Mrs. Milstead. He could walk around the house, but she had to bathe him, and he was unable to talk on the telephone.
At 5:23 p.m. on Wednesday, January 13, 1988, Mrs. Milstead left their home to go to Family Night Supper and Prayer Meeting at her church, leaving Mr. Milstead in their home. As she pulled out into the highway, she noticed a black man walking, wearing a toboggan (rolled type hat), an army jacket and dark pants which could have been jeans. He was light skinned and about six feet tall.
She returned from church just before 9:00 p.m., and noticed all the lights on in the house, which she attributed to her husband. She then went into the bedroom and noticed a jewelry box upside down on the bed, and another upside down on the dresser. She asked Mr. Milstead if he had done this, which he denied. Then, suspecting something amiss, she went out on their porch, and noticed the bottom part of a storm window had been kicked or knocked out, with the shutter splintered from the window and laying across the couch. She called the sheriff’s office, and Deputy Sheriff Elbert Craig shortly came out to the house.
Mrs. Milstead noticed that a cluster ring was missing. She said the jewelry boxes for the most part contained only costume jewelry.
A few days later Craig telephoned Mrs. Milstead and asked her if she was also missing a man’s ring. She then discovered that a ring given Mr. Milstead when in high school by his father was missing and described it to the sheriff. She said it was a gold ring with a black onyx set and the initial “M.” A ring was then brought to her which she identified as the missing ring even though the ring no longer contained the onyx set. Although she was certain this was her husband’s missing ring, she nevertheless put it on his finger to see if it fit. It did.
L.D. Wall, a retired minister, and his wife also lived just outside Cleveland on the Old Ruleville Road. On January 13, 1988, he and Mrs. Wall were on vacation for several days. Ronnie Wall, their son, was periodically checking on their house while they were away. Just after dark he drove to the house, and as he pulled in to park, he noticed the metal security door was broken off and leaning against his father’s car, a 1987 Chevrolet Caprice, parked in the carport. He then noticed that a window in the kitchen door had been broken.
Wall left the house, went to a nearby store and called the sheriff’s office. He was gone approximately twelve minutes from the house. Deputy Sheriff Elbert Craig received this call at 6:31 p.m., and was at the house within ten minutes. At first he did not know precisely which house was involved and as he was looking, Ronnie Wall returned from the store.
When Wall returned, his father’s car was missing. Craig radioed a description of the car, including the fact that it carried a Disabled American Veteran’s tag.
The two then went into the house, and noticed that it had been ransacked. All the drawers were pulled out. The only thing Wall noticed missing at the time, however, was a .410 gauge single-shot shotgun which his father had given him as a child.
Craig received a call that a Cleveland policeman was following the described vehicle. This officer, Mickey Parrott, followed the car into the Bolivar County Hospital parking lot. He saw a man get out of the car and go into the emergency room of the hospital. He noticed that he was wearing a pull-over cap and an army fatigue jacket. Parrott recognized the man but *1314 could not recall his name at the time. The man did not return to the car.
When Craig and Wall got to the hospital parking lot, Wall identified the car as Reverend Wall’s car, and found the .410 shotgun on the back seat. Neither he nor his father had put the shotgun in the car. The last time either of them had previously seen the gun, it was in the house.
There were two sets of keys to the Chevrolet car. One set was left on the dinette table in the kitchen, the other on a shelf beneath the telephone. When the car was found in the hospital parking lot, it had no keys in it, and the set on the dinette table were missing and never recovered.
On January 19 Craig arrested Campbell in Mound Bayou, and described his behavior as he was being transported handcuffed to the Bolivar County jail:
Q. All right. What, if anything, unusual took place or did you observe anything unusual while you were transporting him down here?
A. Okay. When we was coming from Merigold, he said that the handcuffs was getting tight. Well, I knew that was a story because I had locked the handcuffs so they couldn’t tighten up on him. And he said they was hurting his arm. So I told him we would be there in a few minutes because he was asking me about letting him put them in front of him. I said, “No, we will be there in a few minutes.” So when we got to the office I went around and unlocked the door—
Q. —what was he doing, if anything?
A. Moving and wiggling. I just told him to put his hand in one place and keep them there because that way they won’t hurt him. And I cut the interior light on to make sure, you know, because he was moving so much.
Q. All right. He was squirming around?
A. Right.
Q. Where was he sitting?
A. On the front seat on the passenger side.
Q. Okay. He was sitting by you in the front seat?
A. Yes, sir.
Q. Was it dark?
A. Yes, sir.
Q. And I understand that you cut the light on to see why he was moving so much?
A. Yes, sir, that is when he told me that the handcuffs was hurting him.
Q. All right. When you handcuffed him earlier up at Mound Bayou, was he wearing any jewelry?
A. Yes, sir, he had a ring on his finger. Of course, it didn’t mean nothing to me at that time. But when I got him inside the sheriff’s department, I started to take the handcuffs off of him and I noticed that he didn’t have the ring on anymore and I asked him what did he do with that ring that he had on his finger. He said he throwed it away but he first said, “What ring. What are you talking about?” I said the ring that you had on your finger when I put the handcuffs on you. He said, “I don’t know what you are talking about.” So at that time he said, “Well, I throwed it away.” I said, no, and I told the jailer to sit there and watch him, don’t let him move, don’t let him talk and I went out and checked my car because the white part of his finger where he had been wearing the ring was still there and that’s when I told the jailer to sit there and watch him and I went outside and looked in the backseat— well, in the back part of the front seat and I run my hand around it and that’s when I come up with the ring, the same ring that he had on.
Q. All right. That would be between the seats?
A. Yes, sir.
Q. In the back of the seat itself?
A. Yes, sir.
Q. And you found the ring?
*1315 A. Yes, sir.
Q. All right. I want to hand you State’s exhibit 1 and ask you if you can identify that?
A. (Witness examines) Yes, sir, this is the ring that he had on.
(R.60)
Craig telephoned Mrs. Milstead. When she saw it, she recognized the ring as the missing ring belonging to Mr. Milstead, and later identified the ring in court.
Campbell was indicted by the grand jury of the Second Judicial District of Bolivar County on April 19, 1988, on three counts:
Count One — burglary of the Milstead residence;
Count Two — burglary of the Wall residence; and
Count Three — larceny of the Chevrolet automobile.
Campbell was also indicted as an habitual offender under Miss.Code Ann. § 99-19-81 (Supp.1990).
At trial, in addition to the facts above related, Mrs. Milstead testified that the ring Craig had recovered was her husband’s ring.
Mickey Parrott, the Cleveland policeman, testified to following the Chevrolet car into the hospital parking lot on the evening of January 13, seeing a black man get out, and then identified Campbell in court as the man he saw driving and leaving the ear.
Mrs. Lula Hodges, a nurse in the emergency room of the hospital, testified to seeing a black man come into the emergency room and walk on out around 7:00 o’clock the night of January 13. She said they were not busy. She did not know him, but described him as having hair “kinda like, maybe, curled,” wearing a cap and a greenish jacket. She recalled him as “a tall, fair skin person.” He appeared to her to have some keys in his hand. She also made an in-court identification of Campbell as the man she saw walk in and then out of the emergency room.
The State then rested.
Campbell’s first witness, Eddie Lee Hooper of Mound Bayou, testified to seeing Campbell at the “Isaac Daniel Apartments” around “4:30 — 5:00 something like that,” on January 13, and “about dusk dark” just outside the “Paradise Lounge.” He was wearing jeans and a blue shirt. He did not remember a hat.
Marty Joe Easter was asked about the ring introduced in evidence, and asked if he had ever seen it before. He said it was “a possibility because I was dealing in a lot of gold rings, necklaces and so forth at the state penitentiary.” He was unable to identify the ring.
Donald Davis was likewise asked to identify the ring, but was unable to do so. “It looks like a ring that I saw once over at the camp at Parchman.” He was not sure who had it on. On cross-examination he said he was positive, and then testified, “I am saying that I believe that is one of the rings I seen floating around at the camp.” He and Campbell were in the same camp at Parch-man.
Debra Fields testified to first seeing Campbell at the “Paradise” around six on the evening of January 13, and at the latest around 10:00 that evening. On cross-examination she admitted previously telling an investigator with the district attorney’s office that as far as she knew she was not with him on that particular day, January 13. She had said nothing to him about seeing Campbell at the Paradise Lounge.
Ora Campbell, an aunt of Campbell’s, testified to seeing the ring at her house when Deputy Sheriff Craig had it on January 19, and also testified she had seen Campbell with the ring about three weeks before then. On cross-examination she testified she saw Campbell with the ring shortly before he was arrested.
Campbell testified that he was 21 years of age, and living in Mound Bayou on January 13. He left home around 4:00 that afternoon walking. He went to the Paradise, a club in Mound Bayou, around 5:00 p.m. and stayed there until around 6:16 p.m. He saw a lot of people there. He then went to Debra Fields’ house where he stayed until around 10:00 p.m. He then went to a hotel in Mound Bayou.
*1316 He denied owning a green fatigue army jacket. He said that he had bought the court-identified ring from Marty Joe Easter “about a year and two months ago,” paying him a “$10 and two $5s.” It had no stone in it. He said he was wearing the ring the night he was arrested by Craig.
He denied the burglaries, and testified he was not around Cleveland that night. He said that he had seen nurse Hodges five or six times. He also testified Craig lied when he said he was trying to hide the ring.
The jury convicted Campbell of all three of the counts in the indictment. The trial court sentenced him to a total of 30 years without parole. Campbell appealed his conviction to this court.
LAW
I.THE STATE OF MISSISSIPPI FAILED TO PROVE A PRIMA FA-CIE CASE AS CHARGED IN THE INDICTMENT.
Campbell’s first assignment of error challenges the sufficiency of the evidence. On the burglary of the Wall residence and larceny of the automobile a jury issue was clearly presented. The corpus delicti of burglary and theft of the automobile were clearly proven. There was sufficient evidence for the jury to conclude that Campbell was in possession of the freshly stolen Wall automobile, as well as a shotgun from the freshly burglarized Wall residence. From this evidence the jury could rationally conclude he was the person who broke into the Wall residence, stole the shotgun and also stole the Wall automobile. Toncrey v. State, 465 So.2d 1070 (Miss.1985).
Campbell’s guilt of the burglary of the Milstead residence would be less compelling in the absence of Campbell’s conduct in reference to the ring. From the evidence, however, the jury had the right to conclude that he was in possession of a ring belonging to Mr. Milstead and taken from the Milstead residence six days previously. This fact, coupled with deputy sheriff Craig’s testimony of Campbell’s incriminating behavior, again made a jury issue as to whether or not Campbell was the person who burglarized the residence. Id.
II. IT WAS PLAIN ERROR FOR THE TRIAL JUDGE AND COUNSEL TO ENCOURAGE THE DEFENDANT TO TESTIFY IN THE TRIAL OF THE CASE AFTER HE HAD TWICE REFUSED TO DO SO.
The record before this Court does not support this assignment of error. This trial judge followed the directive of Culberson v. State, 412 So.2d 1184, 1186-87 (Miss.1982). The trial judge called the defendant, Campbell, before the court out of the presence of the jury and advised him of his right to testify. The judge also advised the defendant he was not required to testify. Finally, a record was made of the proceedings so that there is no question about Campbell’s decision to testify. This is not error.
III. IT WAS PLAIN ERROR FOR THE TRIAL JUDGE AND COUNSEL FOR THE DEFENDANT TO REFUSE TO FILE DEFENDANT’S REQUESTED MOTION FOR SEVERANCE OF TRIAL ON EACH COUNT OF THE INDICTMENT.
Campbell alleges in his brief that he requested his trial counsel file a motion for severance of the counts of the indictment in order to schedule separate trials. There is no record of such a request. Facts asserted in the litigant’s brief must be in the record. Mason v. State, 440 So.2d 318, 319 (Miss.1983); Nathan v. State, 552 So.2d 99, 108 (Miss.1989); Cooper v. State Farm Fire & Casualty Co., 568 So.2d 687, 697 (Miss.1990).
We find no error, and affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.